The **MEDICAL PROTECTIVE COMPANY, Appellant**

v.

**Bob J. HERRIN, M.D., Appellee.**

No. 06–06–00048–CV.

Court of Appeals of Texas, Texarkana.

Submitted July 18, 2007.

Decided Oct. 3, 2007.

Michael W. Huddleston, J. Stephen Gibson, Shannon, Gracey, Ratliff, Miller, LLP, Dallas, for appellant.

Eddie M. Krenek, Tricia T. Connally, Law Office of Eddie M. Krenek, Katy, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

After a trial on the merits of his lawsuit, a nonunanimous jury returned a verdict in favor of Dr. Bob J. Herrin against The Medical Protective Company, Herrin's former malpractice insurer. That verdict specifically found Medical Protective had violated the Texas Deceptive Trade Practices Act (DTPA) and awarded $100,000.00 in damages for Medical Protective's "knowing" violation of the DTPA. The jury further found Medical Protective had defrauded Herrin and awarded him $250,000.00 on that claim. Additionally, the jury awarded attorney's fees.

Medical Protective now appeals the jury's verdict, raising a plethora of appellate issues. We find merit in two of the issues raised by Medical Protective and, for the reasons stated below, we sustain those points of error and reverse the trial court's judgment, rendering a take-nothing judgment in favor of Medical Protective.

## I. Prior History

This is not the first time this case has come before us on appeal. Six years ago, Herrin had appealed the trial court's award of summary judgment in favor of Medical Protective. *Herrin v. Med. Protective Co.*, 89 S.W.3d 301 (Tex.App.-Tex-

arkana 2002, pet. denied). We affirmed the trial court's judgment in part, reversed it in part, and remanded the case for further proceedings. *Id.*

## II. The Evidence Adduced at Trial in This Case

The evidence at trial showed Herrin is a retired general surgeon who has lived and worked in Marshall, Texas, for most of his nearly fifty-year career. During most of that time (until 1998), Medical Protective provided medical malpractice insurance to Herrin. In 1994, Herrin performed laparoscopic gall bladder surgery on a twenty-five-year-old female. Unbeknownst to Herrin at the time, there were problems with the surgery. Herrin transected the patient's common bile duct during the operation, resulting in bile spilling into her abdomen for several days before the error was corrected by two other surgeries (performed by a different surgeon). The patient suffered severe complications as a result.

The patient sued Herrin, and that case settled in 1996 (following mediation) for $300,000.00. (This amount was less than Herrin's Medical Protective policy limit of $500,000.00.) Herrin testified at trial in the current case that, at the time of that settlement, he was promised by Chuck Curtice (Medical Protective's agent) that the doctor's agreement to the settlement would not result in the cancellation or nonrenewal of his malpractice insurance with Medical Protective. Herrin, however, later stated he was promised only that his malpractice insurance would not be cancelled and testified that he was *not* promised that his malpractice insurance would not be nonrenewed.

In 1997, Medical Protective renewed Herrin's malpractice insurance. *Id.* at 304. But in 1998, the company did not renew Herrin's policy because of the high "frequency" and "severity" of claims against his policy. *Id.* After more than forty years of doing business with Medical Protective, Herrin had to find a replacement insurance carrier, which he was able to do before the expiration of his then-current policy. Herrin, therefore, suffered no lapse in coverage.

Herrin's new carrier, Frontier Insurance, kept Herrin's business for three years, but Frontier then withdrew entirely from the Texas market, leaving Herrin to find yet another company to provide him with medical malpractice coverage. By this time, Herrin was over seventy years old and found himself unable to obtain the same type of insurance policy he had been purchasing for the entirety of his career. *Id.* (Herrin wanted "occurrence" coverage, but he could only find "claim" coverage.) Herrin then "retired prematurely from practicing medicine because he could not receive the necessary coverage to continue his surgery practice." *Id.*

Subsequent to his retirement, Herrin sued Medical Protective for the damages (reduced earning capacity and mental anguish) he associated with what he considered to be a "forced" early retirement caused by Medical Protective's decision to nonrenew his insurance coverage three years earlier. That lawsuit went to trial and resulted in a jury verdict adverse to Medical Protective, which the insurance company now appeals.

## III. Analysis of the Issues Presented

■ In one of its issues, Medical Protective contends the evidence is legally insufficient to support the jury's finding that Medical Protective violated the DTPA. Assuming (without so deciding) that the jury correctly found Medical Protective violated the DTPA, the jury's verdict in this case creates an additional problem: The jury found Herrin suffered no actual dam-

ages as a result of Medical Protective's alleged DTPA violation. Instead, the jury found Herrin's only compensable injuries for the alleged DTPA violation came from Herrin's resulting mental anguish. Therefore, Medical Protective now contends this finding regarding mental anguish damages is unsupported by legally sufficient evidence.

 In reviewing a challenge to the legal sufficiency of the evidence, this Court must consider all of the evidence in a light most favorable to the party in whose favor the verdict was rendered. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex.2003). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

 The process of awarding damages for amorphous injuries such as mental anguish is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Dollison v. Hayes*, 79 S.W.3d 246, 249 (Tex.App.-Texarkana 2002, no pet.). Juries are generally afforded wide discretion in awarding a damages amount for mental anguish because our law provides no absolute, objective guidelines to assess the monetary equivalent to such injuries. *See Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex.1997). Nevertheless, the Texas Supreme Court has explicitly stated a plaintiff may not recover damages for mental anguish unless the plaintiff provides (1) direct evidence of the nature, duration, or severity of the anguish establishing a substantial disruption of the daily routine, or (2) other evidence of a high

degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996) (referencing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). In *Saenz*, this State's highest civil court noted that the *Parkway* plaintiffs' concerns about flooding were both real and understandable; but the court also recognized that those same *Parkway* plaintiffs had "failed to prove that their distress involved more than these emotions." *Id.*

In the case now on appeal, Herrin testified he felt "[t]errible" when he received the nonrenewal notice from Medical Protective. He testified he was "[t]remendously" upset that Medical Protective wrote him a letter saying his claims were both frequent and severe, although Herrin did not further elaborate on what he meant by this "tremendous" feeling of upset. He also testified that, following the nonrenewal, Herrin felt like he could no longer get his work done as easily as he once could, that the work itself was no longer as pleasant as it once had been, and that his work became more difficult instead of being something enjoyable. He also theorized he had become somewhat suicidal based on having once decided to drive his new motorcycle at an extremely excessive rate of speed.[1]

Herrin provided no testimony or evidence that his claimed mental anguish had any detriment to his physical health. Nor did Herrin present evidence that he sought professional psychiatric assistance or received medication to help him cope with his alleged mental anguish. There was no testimony from Herrin or other witnesses regarding the severity of any anguish that demonstrated a substantial disruption to

---

1. Herrin later admitted he was never truly suicidal; he had only been engaging in un- characteristically risky behavior.

Herrin's daily routine, as would be required to support a compensable mental anguish claim. In short, the evidence before the jury regarding Herrin's mental anguish damages showed nothing more than mere worry, anxiety, vexation, embarrassment, or anger. Therefore, we cannot say the jury's finding that Herrin suffered compensable mental anguish is supported by legally sufficient evidence. We sustain this point of error.

█ In another point of error, Medical Protective contends the evidence is legally insufficient to support the jury's finding that it committed fraud. The jury awarded Herrin $250,000.00 in damages for his fraud claim. Herrin's claim of fraud was premised on his belief that Curtice (an employee of Medical Protective with whom Herrin had worked for many years) had promised Herrin that the doctor's consent to settling the 1996 malpractice claim for $300,000.00 would not cause Medical Protective to cancel or nonrenew his malpractice insurance.

█ The elements of fraud are (1) a material misrepresentation was made by the opposing party; (2) that representation was false; (3) when that representation was made, the speaker knew it was false or made the statement recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party act on it; (5) the party acted in reliance on that representation; and (6) the party thereby suffered injury. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 211 n. 45 (Tex.2002).

Assuming (without deciding) that Herrin met his burden of proof on the first five elements of his fraud claim, a review of the entire record before us reveals no evidence (and certainly not legally sufficient evidence) that Herrin suffered any injury as a result of relying on Curtice's alleged promise that the doctor's assent to settlement of the 1996 malpractice lawsuit would cause the cancellation or nonrenewal of his insurance. We reach this conclusion for several reasons.

First, Medical Protective *did* renew Herrin's malpractice insurance for the policy year following the 1996 settlement. Second, for the years following Medical Protective's decision not to renew Herrin's insurance, Herrin's net income either rose (sometimes by as much as twenty-five percent) or remained about the same as his final years with Medical Protective.

Third, Herrin asserted his overall surgical referrals had gone down since 1997, but he also explained that this decline was attributable to his own professed desire to slow down his practice and the recent arrival of two new orthopedic surgeons to the Marshall community. In fact, Herrin admitted at trial he had no proof he had lost *any* referrals as a result of Medical Protective's nonrenewal decision. Fourth, following Medical Protective's decision to not renew his insurance, neither Frontier Insurance (Herrin's 1998 replacement insurer) nor the Marshall hospital restricted Herrin's surgical privileges in any way.

Finally, a variety of reasons leads us to conclude that the testimony of Herrin's expert regarding Herrin's damages for fraud failed to establish a causal connection between Herrin's alleged damages and Medical Protective's alleged fraud. Initially, we note that the expert's opinion was based on several presumptions that were false. The expert first assumed Herrin's hospital privileges had been restricted during the years following Medical Protective's nonrenewal. Yet even Herrin himself conceded that his privileges had *not* been curtailed during the relevant time period. The expert's economic loss projections were also based on the premise that

Medical Protective had told people in the Marshall community that Herrin was, in essence, a bad doctor. This assumption was necessary for Herrin's expert to link the expert's economic loss projections to Medical Protective's conduct. But the jury heard no evidence from any source that Medical Protective told anyone—other than Herrin himself—of the company's decision not to renew. Instead, all the evidence at trial showed that Herrin was the person who told others about his insurance being nonrenewed. Thus, the expert's economic loss projections could not be linked to any conduct by Medical Protective. In fact, the expert conceded that, if the evidence at trial showed it was Herrin himself who was responsible for telling others in the Marshall community about the nonrenewal, then all of the expert's damages calculations could not be attributed to Medical Protective.[2] Thus, as a matter of law, the expert's damages calculations could not support a finding of loss in this case because the purported conduct on which those calculations were based was not engaged in by Medical Protective or was conduct (such as a limitation of Herrin's surgical privileges) that never occurred.

Accordingly, we cannot say there is legally sufficient evidence of any fraud damages (assuming, without deciding, that there was legally sufficient evidence to support the first five elements of the fraud cause of action). Neither direct nor indirect evidence links Herrin's claimed damages to any conduct by Medical Protective. Herrin's insurance was renewed in 1997, the policy year following the $300,000.00 malpractice settlement. The evidence in this case does not support Herrin's claim of fraud.

## IV. Conclusion

The jury found only that Medical Protective had violated the DTPA and committed fraud. The jury's sole basis for awarding damages under the DTPA claim was for Herrin's claim of mental anguish. We have concluded the mental anguish damages awarded by the jury were not supported by legally sufficient evidence. Similarly, the jury's $250,000.00 award for Herrin's fraud cause of action was not supported by legally sufficient evidence inasmuch as there was no evidence that tended to connect Medical Protective's alleged fraudulent conduct to Herrin's alleged pecuniary losses.

Therefore, for the reasons stated, we reverse the trial court's judgment based on the jury's verdict, and we render a judgment in favor of Medical Protective that Herrin take nothing.

---

2. The expert told the jury, "Yeah, if you shoot yourself in the foot, I guess you're responsible for your own shooting."